UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

DASSAULT FALCON 2000EX,
SERIAL NUMBER 17,
TAIL NUMBER YV3360,

      Defendant *In Rem*.

_____/

## **VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, United States of America, through the undersigned Assistant United States Attorneys for the Southern District of Florida and Trial Attorney for the U.S. Department of Justice, National Security Division, files this verified civil complaint for forfeiture *in rem* and alleges as follows:

### **NATURE OF THE ACTION**

1.      This is a civil action *in rem* to forfeit a Dassault Falcon 2000EX, serial number 17, currently bearing tail number YV3360 (the "Defendant Aircraft"), seized at the request of the United States on or about February 6, 2025, in Santo Domingo, Dominican Republic, and currently located there.



2.     The grounds for forfeiture are violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1709, and related Executive Orders ("E.O.") sanctioning Nicolás Maduro Moros ("Maduro"), Maduro's representatives in the Bolivarian Republic of Venezuela ("the Maduro Regime"), and Petroleos de Venezuela, S.A. ("PdVSA"), the Venezuelan state-owned oil and natural gas company; smuggling of goods from the United States, in violation of 18 U.S.C. § 554; violations of the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. §§ 4801–4852, and the Export Administration Regulations ("EAR"), 15 C.F.R. parts 730–774; and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).

3.     The Court has jurisdiction over this subject matter under 28 U.S.C. §§ 1345 and 1355.

4.     The Court has *in rem* jurisdiction over the Defendant Aircraft under 28 U.S.C. § 1355.

5.     The Court has venue over this action under 28 U.S.C. §§ 1355 and 1395.

## STATUTORY AND REGULATORY BACKGROUND

**I.      IEEPA and Venezuela-Related Sanctions**

6.      Under IEEPA, the President of the United States is granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). IEEPA authorizes the President to declare a national emergency with respect to such threats through Executive Orders that have the full force and effect of law.

7.      Since 2014, the United States has imposed incremental sanctions on targeted individuals, entities, and sectors in Venezuela to address the increasing political oppression and corruption in Venezuela that began shortly after Maduro assumed office in March 2013.

8.      On March 8, 2015, the President issued E.O. 13692, which found that the situation in Venezuela, including certain actions and policies of the Government of Venezuela under Maduro, constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States and declared a national emergency pursuant to IEEPA to deal with that threat. 80 Fed. Reg. 12747 (March 8, 2015).

9.      In multiple subsequent Executive Orders, in 2017, 2018, and 2019, the President took additional steps regarding the national emergency declared in E.O. 13692, which remain in effect today.

10.      Among those Executive Orders, on November 1, 2018, the President issued E.O. 13850, which broadened the scope of sanctions on Venezuela. *See* 83 Fed. Reg. 55243 (Nov. 1, 2018). Section 1 of E.O. 13850 granted the Treasury Secretary the authority to block the property and interests in property in the United States of persons operating in any sector of the Venezuelan economy as determined by the Treasury Secretary.

11.     On January 28, 2019, pursuant to E.O. 13850, the Treasury Secretary determined that persons operating in Venezuela's oil sector may be subject to sanctions. Sections 4 and 5 of E.O. 13850 prohibit: (1) "making any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order"; (2) "the receipt of any contribution or provision of funds, goods, or services from any such person"; (3) "[a]ny transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order"; and (4) "[a]ny conspiracy formed to violate any of the prohibitions set forth in this order." *Id.*

12.     On the same day, OFAC designated PdVSA pursuant to E.O. 13850 and added it to the Specially Designated Nationals and Blocked Persons ("SDN") List for operating in the Venezuelan oil sector. As a result, U.S. persons, including U.S. companies and financial institutions, are prohibited from transacting with PdVSA, absent authorization from OFAC in the form of a license.

13.     On August 5, 2019, the President issued E.O. 13884, taking further steps with respect to the national emergency declared in E.O. 13692 "in light of the continued usurpation of power by Nicolás Maduro and persons affiliated with him," among other reasons. *See* 84 Fed. Reg. 38843 (Aug. 5, 2019).

14.     Section 1 of E.O. 13884 blocks all property and interests in property of the "Government of Venezuela" that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person. *Id.*

15.     The "Government of Venezuela" is defined as:

the state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), any person owned or controlled, directly or indirectly, by the foregoing, and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, including as a member of the Maduro regime.

*Id.* § 6(d).

16.     "United States person" means "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States." *Id.* § 6(c).

17.     Sections 3 and 4 of E.O. 13884 prohibit (1) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to the order, including the Government of Venezuela as defined in § 6(d); (2) the receipt of any contribution or provision of funds, goods, or services from any such person; (3) any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in the order; and (4) any conspiracy formed to violate any of the prohibitions set forth in the order.

18.     To further implement E.O. 13692 and subsequent Executive Orders, OFAC issued the Venezuela Sanctions Regulations. *See* 31 C.F.R. part 591. The Venezuela Sanctions Regulations incorporate by reference the prohibitions set forth in the orders. *See* 31 C.F.R. § 591.201. OFAC's regulations generally prohibit all transactions by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked persons.

19.     Pursuant to 50 U.S.C. § 1705(a), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation,

or prohibition issued under" the IEEPA.

## II.    ECRA and the EAR

20.    ECRA grants the President the authority, among other things, to control "the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons." 50 U.S.C. § 4812(a).

21.    ECRA further grants the Secretary of Commerce the authority to establish the applicable regulatory framework. *Id.* § 4813.

22.    Under that authority, the Department of Commerce ("DOC") reviews and controls the export of certain items, including goods, software, and technologies, from the U.S. to foreign destinations through the EAR, 15 C.F.R. parts 730–774.

23.    In particular, the EAR restricts the export of items that could significantly contribute to the military potential of other nations or could be detrimental to the foreign policy or national security of the United States.

24.    The EAR imposes licensing and other requirements for items subject to the EAR to be exported lawfully from the United States or lawfully reexported from one foreign destination to another.

25.    The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1.

26.    CCL items are categorized by Export Control Classification Number ("ECCN"), each with export control requirements depending on destination, end use, and end user.

27.    In addition to license requirements for items specified on the CCL, 15 C.F.R. § 744.21 prohibits, among other things, the "export, reexport, or transfer (in-country)" of "any

6

item subject to the EAR listed in supplement no. 2 to [part 744] without a license if, at the time of the export, reexport, or transfer (in-country)," the exporter has "'knowledge' . . . that the item is intended, entirely or in part, for a . . . Venezuelan 'military end user.'"

28.    A "military end user" is defined to include "the national armed services" and "government intelligence or reconnaissance organizations." 15 C.F.R. § 744.21(g).

29.    According to 15 C.F.R. § 734.3, "[a]ll items in the United States, including in a U.S. Foreign Trade Zone or moving intransit through the United States from one foreign country to another," and "[a]ll U.S. origin items wherever located" are subject to the EAR.

30.    Pursuant to 50 U.S.C. § 4819(a), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of" the EAR, including, among other acts, "engag[ing] in any conduct prohibited by or contrary to, or refrain[ing] from engaging in any conduct required by" the EAR or "engag[ing] in any transaction or tak[ing] any other action with intent to evade" the EAR. 50 U.S.C. § 4819(a)(2).

## III.    Requirement to File Electronic Export Information

31.    Pursuant to the Federal Trade Regulations, 15 C.F.R. part 30, electronic export information ("EEI") must be filed through the Automated Export System ("AES") for all exports valued over $2,500 and all exports requiring an export license issued by an appropriate government agency.

32.    These requirements aim to strengthen the Government's ability to prevent the export of certain items to unauthorized destinations and end users because the AES aids in targeting, identifying, and, when necessary, confiscating suspicious or illegal shipments before exportation.

33.    A material part of the EEI and AES, as well as other export filings, is

information concerning, among other facts, the ECCN, the license number granting authority for the export, ultimate consignee, and country of ultimate destination of the export.

34.     The true identity of the ultimate consignee or end-user will determine whether the goods: (a) may be exported without any specific authorization or license from the U.S. Government; (b) may be exported with the specific authorization or license from the U.S. Government; or (c) may not be exported from the United States.

35.     On June 29, 2020, BIS revised 15 C.F.R. § 758.1(b)(10) to require the filing of an EEI for all items on the CCL destined for Venezuela, regardless of the shipment's value. 85 Fed. Reg. 23459 (April 28, 2020).

## FACTUAL BACKGROUND

### I.     Purchase and Exportation of the Defendant Aircraft by PdVSA to Venezuela

36.     In July 2017, before the imposition of sanctions on PdVSA, a company in the U.S. entered into an agreement with PdVSA, the Venezuelan state-owned oil and natural gas company, for the sale of the Defendant Aircraft to PdVSA.

37.     As of July 2017, PdVSA has owned the Defendant Aircraft.

38.     Before the sale, the Defendant Aircraft was registered under Federal Aviation Administration ("FAA") Registration #N977CP.

39.     The Defendant Aircraft was deregistered under registration #N977CP in July 2017 for export to Venezuela.

40.     In July 2017, the Defendant Aircraft departed the U.S. without being properly declared for export on the required EEI.

### II.    OFAC Adds the Defendant Aircraft to the SDN List

41.     On January 21, 2020, OFAC identified the Defendant Aircraft as blocked

property of PdVSA pursuant to E.O. 13884 and added it to the SDN List as an aircraft "in which PdVSA has an interest."

42.     As OFAC explained, the Defendant Aircraft was used in late summer 2019 by Venezuelan Oil Minister Manuel Salvador Quevedo Fernandez, also an SDN, to attend an OPEC meeting in the United Arab Emirates.

43.     Throughout 2019, the Defendant Aircraft was also used to transport senior members of the Maduro Regime in a continuation of the former Maduro Regime's misappropriation of PdVSA assets.

### III.     Government of Venezuela's Circumvention of U.S. Sanctions

44.     To procure items in the United States, prohibited end users often provide fraudulent information to U.S. sellers, falsely claiming that the items are being sold domestically, to someone in a third-party country with more favorable export controls, or to an end user who is not otherwise sanctioned or banned.

45.     Sanctioned end users, including those in Venezuela, routinely rely on evasive and deceptive tactics, such as using third-party intermediaries or transshipment points (like the Dominican Republic) to disguise their involvement and circumvent U.S. export controls and sanctions.

46.     Indeed, one former PdVSA employee has pleaded guilty in the Southern District of Florida for conspiring to unlawfully export goods to PdVSA, in violation of 50 U.S.C. § 1705. *See United States v. George Semerene*, Case No. 21-cr-20589-DMM.

47.     In pleading guilty, Semerene, in his role as a PdVSA employee, admitted that he conspired with others to knowingly circumvent U.S. sanctions to obtain aircraft parts for PdVSA's aircraft fleet—including the Defendant Aircraft.

48.     Specifically, Semerene and his coconspirators at PdVSA conspired with individuals at a company in Costa Rica ("Costa Rica Company 1") and a company in Spain ("Spain Company 1") to conceal the fact that aircraft parts purchased in the United States were destined for PdVSA.

49.     Semerene and his coconspirators: (1) lied to the U.S. parts suppliers; (2) made false declarations on customs forms and shipping documents; (3) fabricated supplier invoices; (4) provided false end-user certificates; and (5) shipped aircraft parts through third countries to mask their true destination.

50.     For example, on or about March 27, 2019, and April 5, 2019, Semerene sent emails to his colleagues and supervisor at PdVSA that contained purchase requisition forms for various aircraft parts. The April 2019 email pertained to three aircraft—including the Defendant Aircraft. Notably, the purchase requisition forms specifically discussed the U.S. sanctions in place and that PdVSA would be forced to obtain quotes from companies operating outside the United States.

51.     Thereafter, Semerene and his coconspirators worked with representatives from Costa Rica Company 1 and Spain Company 1 to secure aircraft parts from the United States by leveraging Costa Rica Company 1's location in Costa Rica and Spain Company 1's location in Spain.

52.     The conspirators agreed that Costa Rica Company 1 would purchase parts from the United States on behalf of PdVSA and smuggle them through Costa Rica, ultimately delivering them to PdVSA in Venezuela.

53.     To effectuate this plan, the conspirators discussed with Costa Rica Company 1 the setting up of bank accounts in third countries such as Russia, China, or Malaysia, to

ensure that the payments would be processed and to avoid scrutiny associated with bank accounts in the United States and Europe.

54.     Further, the conspirators agreed that it was important that PdVSA not appear on any paperwork, to ensure that the banks would carry out the payments.

**IV.     U.S.-Origin Parts Installed on Defendant Aircraft in Violation of U.S. Sanctions**

55.     Since at least 2020, and after the imposition of sanctions on PdVSA and the Maduro Regime, the Defendant Aircraft has received and was scheduled to receive more than $1 million in parts and services in violation of U.S. sanctions.

56.     The parts include, but are not limited to, an aircraft brake assembly (part number C20544000, serial number 00561) (the "Brake"); a Flight Management Computer (part number 822-0868-057, serial number 1419) (the "FMC"); and four Electronic Flight Displays (part number 622-9978-126, serial numbers 2499, GNKN, 10WRM, 2TDRD) ("EFD").

57.     To begin, on or about August 2020, Costa Rica Company 1 wired approximately $21,730.51 from Costa Rica into the account of a company located in the Southern District of Florida to repair the Brake.

58.     The Brake is listed as controlled for export under CCL ECCN 9A991.d.

59.     Costa Rica Company 1 caused the freight forwarder to provide false information to the U.S. government on the EEI by listing the ultimate consignee as Costa Rica Company 1 in Costa Rica.

60.     Costa Rica Company 1, however, does not own any aircraft.

61.     Instead, the Brake was installed on the Defendant Aircraft, where it remains today.

11

62.     On or about October 21, 2020, the Brake was exported from Miami to Costa Rica Company 1 without the required BIS or OFAC licenses.

63.     In total, Costa Rica Company 1 paid approximately $33,730 for the Brake in the United States.

64.     PdVSA, however, paid approximately 138,750 Euros ($163,294 using the exchange rate on the date of export) for the Brake, a significant markup meant to cover the risk of dealing with a sanctioned end-user, such as PdVSA.

65.     In addition, in or around April 2019, a PdVSA employee emailed Costa Rica Company 1, among others, about the FMC, which was in PdVSA's possession and needed repair.

66.     An employee for Costa Rica Company 1 sent a follow-up email to PdVSA employees, which contained an attachment listing the Defendant Aircraft and, among other parts, an FMC with a sale price to PdVSA of $15,300.

67.     In or around February 2021, after the U.S. imposed sanctions on PdVSA and the Government of Venezuela, the FMC was reinstalled on the Defendant Aircraft.

68.     The FMC had been produced in Melbourne, Florida.

69.     In addition, as with similar parts, the FMC was likely repaired in the United States before being reinstalled in the Defendant Aircraft.

70.      The FMC is listed on the CCL under ECCN 7A994.

71.     No BIS or OFAC license was obtained to export the FMC to PdVSA in Venezuela.

72.     Moreover, in or around August 2021, an employee of Spain Company 1 sent an email to a PdVSA employee, attaching an offer for an EFD for 112,000 Euros

(approximately $132,910).

73.     The EFD is listed on the CCL under ECCN 7A994.

74.     Upon information and belief, the EFD was later installed on the Defendant Aircraft.

75.     The Defendant Aircraft currently has four EFDs installed with the 622-9978-126 part number.

76.     The four EFDs installed on the Defendant Aircraft are of U.S. origin (made in Florida). They are, therefore, subject to the EAR.

77.     The last known shipping addresses for these four EFDs were also U.S. locations, not Venezuela.

78.     According to the Defendant Aircraft's logbook, these EFDs were installed between August 2021 and June 2022—after sanctions were imposed on PdVSA and the Maduro Regime.

79.     No BIS or OFAC license was obtained to export the EFD to PdVSA in Venezuela.

80.     PdVSA typically only purchases replacement aircraft parts when they break or are due for scheduled maintenance.

81.     PdVSA does not hold parts in inventory because it has difficulty finding reliable vendors willing to violate U.S. sanctions, and also because it has difficulty paying those vendors.

82.     Thus, there is no reason to believe that PdVSA had purchased and held in inventory the above-mentioned parts before it was sanctioned.

## V.      The Defendant Aircraft's Arrival in the Dominican Republic for Maintenance

83.      On or about March 11, 2024, the Defendant Aircraft departed Venezuela to be serviced and repaired at the La Isabela International Airport in Santo Domingo, Dominican Republic, by a Dominican-based jet maintenance business operated by a U.S. person ("Maintenance Company 1").

84.      Maintenance Company 1 was scheduled to provide the Defendant Aircraft with approximately $369,448 in services and parts.

85.      The items to be serviced included a Stator Assembly, a part related to the aircraft turbine engine.

86.      The Stator Assembly and the labor to install it would have cost $192,953.

87.      According to Maintenance Company 1's owner, Maintenance Company 1 would have procured this item from the United States for use on the Defendant Aircraft had law enforcement not intervened.

88.      The maintenance was directed by a Venezuelan National linked to the Maduro Regime through several investigations ("Venezuelan Principal 1").

89.      Venezuelan Principal 1 purported to act on behalf of a company allegedly located in the Caribbean nation of Saint Vincent and the Grenadines ("St. Vincent Company 1").

90.      St. Vincent Company 1 presented itself to Maintenance Company 1 as the owner of the Defendant Aircraft and other aircraft linked to the Maduro Regime.

91.      But an investigation into St. Vincent Company 1 revealed that, in truth, St. Vincent Company 1 acted as a nominee owner of aircraft beneficially owned and used by the Maduro Regime, including the Defendant Aircraft.

92.     Law enforcement could not find any paperwork showing a sale or transfer of ownership of the Defendant Aircraft from PdVSA to anyone outside of Venezuela.

93.     According to corporate and official documents from St. Vincent, St. Vincent Company 1 was formed on or about June 24, 2022, as an "Assets Holding Company."

94.     In or about May 2024, the St. Vincent and the Grenadines Financial Services Authority struck St. Vincent Company 1 from its Register for failure to pay its annual fees.

95.     Those same records later show a September 2024 payment for "Resignation of Agent," and no further corporate activity in the public record.

96.     During the maintenance process, Venezuelan Principal 1 and St. Vincent Company 1 concealed that they were representing or associated with the Maduro Regime.

97.     Venezuelan Principal 1 provided Maintenance Company 1 with a cash deposit of approximately $89,400 as a down payment for the work to be performed on the Defendant Aircraft in the Dominican Republic.

98.     On or about June 10, 2024, a license history check on all the related parties in this transaction from OFAC stated that there are no responsive records of applications submitted by or on behalf of any of the involved parties or any OFAC licenses issued that authorized any transactions with the Defendant Aircraft.

**VI.     Post-Seizure Admissions by the Maduro Regime**

99.     On September 2, 2024, Venezuela issued a *Comunicado*, or communiqué, concerning the seizure of the Defendant Aircraft, admitting that PdVSA still owns the Defendant Aircraft:



**¡Marco Rubio, de mercenario del odio a ladrón de aviones!**

La República Bolivariana de Venezuela denuncia ante el mundo el robo descarado de una aeronave propiedad de la nación venezolana, ejecutado por orden del secretario de Estado de EE.UU. Marco Rubio. Su odio hacia Venezuela lo lleva ahora al delito abierto, confiscando ilegalmente un avión de PDVSA con la complicidad del gobierno cipayo de la República Dominicana.

Este ataque contra Venezuela demuestra que Rubio no es más que un delincuente disfrazado de político, usando su cargo para saquear y despojar a nuestro país de sus bienes. Su odio lo convierte en un delincuente internacional, capaz de violar cualquier norma con tal de dañar a nuestra Patria.

Venezuela tomará todas las acciones necesarias para denunciar este robo y exigir la devolución inmediata de su aeronave. Marco Rubio pasará a la historia como lo que es: un ladrón y un enemigo declarado de nuestro pueblo.

Caracas, 7 de febrero de 2025

100.    Translated, the *Comunicado* (Communiqué) reads:

**Marco Rubio, from mercenary of hate to thief of airplanes!**

The Bolivarian Republic of Venezuela denounces before the world the blatant theft of an aircraft owned by the Venezuelan nation, carried out by order of U.S. Secretary of State Marco Rubio. His hatred towards Venezuela led him to crime, illegally confiscating a PDVSA aircraft with the complicity of the sepoy government of the Dominican Republic.

This attack against Venezuela proves that Rubio is nothing more than a criminal disguised as a politician, using his office to loot and plunder our country of its assets. His hatred turned him into an international criminal, capable of violating any rule in order to

16

harm our homeland.

Venezuela will take all necessary actions to denounce this theft and demand the immediate return of its aircraft. Marco Rubio will go down in history as what he is: a thief and a declared enemy of our people.

Caracas, February 7, 2025.

### BASIS FOR FORFEITURE

101.     Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a "specified unlawful activity," or conspiracy to commit such an offense, is subject to civil forfeiture to the United States.

102.     A violation of IEEPA, 50 U.S.C. § 1705, or the smuggling statute, 18 U.S.C. § 554, constitutes a "specified unlawful activity" under 18 U.S.C. § 1956(c)(7)(D).

103.     Under 50 U.S.C. § 1705(a), IEEPA makes it a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued under the statute.

104.     Under 50 U.S.C. § 1705(c), IEEPA also criminalizes willful violations of Executive Order 13884 and the Venezuela Sanctions Regulations, 31 C.F.R. part 591.

105.     The smuggling statute, 18 U.S.C. § 554(a), sets forth criminal penalties for "[w]hoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States[.]"

106.    Because 13 U.S.C. § 305 and 15 C.F.R. § 30.71 are "law[s] or regulation[s] of the United States," violations of those provisions in connection with the fraudulent or knowing export, or receipt or facilitation of transportation prior to exportation, can serve as the basis for a violation of the smuggling statute, 18 U.S.C. § 554.

107.    Under 13 U.S.C. § 305, "[a]ny person who knowingly fails to file or knowingly submits false or misleading export information through the . . . SED . . . (or any successor document) or the . . . AES . . . shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both."

108.    Similarly, 15 C.F.R. § 30.71 provides that "[a]ny person, including USPPIs [U.S. Principal Party in Interest], authorized agents or carriers, who knowingly fails to file or knowingly submits, directly or indirectly, to the U.S. Government, false or misleading export information through the AES, shall be subject to a fine not to exceed $10,000 or imprisonment for not more than five years, or both, for each violation."

109.    ECRA's forfeiture provision, 50 U.S.C. § 4819(d), states that "[a]ny person who is convicted under subsection (b) of a violation of a control imposed under section 4812 of this title (or any regulation, order, or license issued with respect to such control) shall, in addition to any other penalty, forfeit to the United States any of the person's property—(A) used or intended to be used, in any manner, to commit or facilitate the violation; (B) constituting or traceable to the gross proceeds taken, obtained, or retained, in connection with or as a result of the violation; or (C) constituting an item or technology that is exported or intended to be exported in violation of this subchapter."

110.    Under 50 U.S.C. § 4819(a)(1), ECRA makes it "unlawful for a person to violate, attempt to violate, or cause, a violation of this subchapter or of any regulation, order, license,

or other authorization issued under this subchapter."

111.     Under, 50 U.S.C. § 4819(b), ECRA also provides criminal penalties for "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids and abets in the commission of, an unlawful act described in subsection (a)[.]"

112.     Under 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of money laundering offenses set forth in 18 U.S.C. § 1956, and any property traceable to such property, is subject to civil forfeiture to the United States.

113.     Under 18 U.S.C. § 1956(h), it is a federal crime to conspire to commit any money laundering offense in violation of 18 U.S.C. § 1956 or 1957.

114.     Under 18 U.S.C. § 1956(a)(1)(A)(i), it is a federal crime to, "knowing that the property involved in a transaction represents the proceeds of some form of unlawful activity, conduct[] or attempt[] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity."

115.     Under 18 U.S.C. § 1956(a)(2)(A), it is also a federal crime to, "transport[], transmit[], or transfer[], or attempt[] to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States … with the intent to promote the carrying on of specified unlawful activity."

**FIRST CLAIM**
**Property Constituting or Derived from**
**Proceeds Traceable to IEEPA Violations**
**(18 U.S.C. § 981(a)(1)(C))**

116.     The factual allegations in paragraphs 1 to 115 are re-alleged and incorporated

by reference herein.

117.    As set forth above, since at least 2020, after the imposition of U.S. sanctions on PdVSA and the Maduro Regime, PdVSA has knowingly evaded, attempted to evade, and conspired with others to evade U.S. sanctions in the service, maintenance, and repair of its aircraft fleet, including the Defendant Aircraft, in violation of IEEPA.

118.    PdVSA and its coconspirators caused U.S. persons to provide or attempt to provide goods and services to and for the benefit of PdVSA and the Defendant Aircraft, such as the procurement of U.S.-origin parts, as well as their maintenance, repair, and installation on the Defendant Aircraft, in violation of IEEPA.

119.    Accordingly, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**SECOND CLAIM**
**Property Constituting or Derived from**
**Proceeds Traceable to Smuggling**
**(18 U.S.C. § 981(a)(1)(C))**

120.    The factual allegations in paragraphs 1 to 115 are re-alleged and incorporated by reference herein.

121.    As set forth above, since at least 2020, after the imposition of U.S. sanctions on PdVSA and the Maduro Regime, PdVSA has fraudulently and knowingly exported or sent from the United States, or attempted to export or send from the United States, merchandise, articles, or objects contrary to the laws or regulations of the United States, or received, concealed, bought, sold, or facilitated the transportation, concealment, or sale of such merchandise, articles or objects, prior to exportation, knowing the same to be intended for exportation contrary to the laws or regulations of the United States in relation to the service, maintenance, and repair of its aircraft fleet, including the Defendant Aircraft, in violation of

18 U.S.C. § 554(a), 13 U.S.C. § 305, and 15 C.F.R. § 30.71.

122.   PdVSA and its coconspirators caused U.S. persons to provide or attempt to provide goods and services to and for the benefit of PdVSA and the Defendant Aircraft, including sensitive CCL-listed, U.S.-origin aircraft parts, without the required OFAC or BIS licenses, in violation of 18 U.S.C. § 554(a), 13 U.S.C. § 305, and 15 C.F.R. § 30.71.

123.   Accordingly, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**THIRD CLAIM**
**Property Constituting or Traceable to Gross Proceeds,**
**and Item or Technology Exported, in Violation of ECRA**
**(50 U.S.C. § 4819(d))**

124.   The factual allegations in paragraphs 1 to 115 are re-alleged and incorporated by reference herein.

125.   As set forth above, since at least 2020, after the imposition of U.S. sanctions on PdVSA and the Maduro Regime, PdVSA has knowingly evaded, attempted to evade, and conspired with others to evade export controls in the service, maintenance, and repair of its aircraft fleet, including the Defendant Aircraft, in violation of ECRA.

126.   PdVSA and its coconspirators caused U.S. persons to provide or attempt to provide goods and services to and for the benefit of PdVSA and the Defendant Aircraft, including sensitive CCL-listed, U.S.-origin aircraft parts, without the required OFAC or BIS licenses, in violation of ECRA.

127.   Accordingly, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 50 U.S.C. § 4819(d).

**FOURTH CLAIM**
**Property Involved in Money Laundering Conspiracy**
**(18 U.S.C. § 981(a)(1)(A))**

128.    The factual allegations in paragraphs 1 to 115 are re-alleged and incorporated by reference herein.

129.    As set forth above, PdVSA transported, transmitted, and transferred, or conspire to transport, transmit, and transfer, funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States in connection with the purchase and repair of U.S.-origin parts for the Defendant Aircraft, with the intent to promote violations of IEEPA and 18 U.S.C. § 554, all violation of 18 U.S.C. § 1956.

130.    Accordingly, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**WHEREFORE**, the United States requests that this Honorable Court issue a warrant for arrest *in rem* for the Defendant Aircraft; that due notice issue to enforce the forfeiture and to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed; that the Defendant Aircraft be condemned and forfeited to the United States of America for disposition according to law; and for such other and further relief as this Court may deem just and proper.

Respectfully submitted,

**HAYDEN P. O'BYRNE**
**UNITED STATES ATTORNEY**

By: */s/ Jorge R. Delgado*
Jorge R. Delgado
Assistant United States Attorney
Florida Bar No. 084118
U.S. Attorney's Office
500 E. Broward Blvd., Suite 700
Fort Lauderdale, FL 33394

Telephone: (954) 660-5954
E-mail: Jorge.Delgado2@usdoj.gov

By: /s/ Joshua Paster
Joshua Paster, Court ID No. A5502616
Assistant United States Attorneys
99 N.E. 4th Street, 7th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9342
E-mail: joshua.paster@usdoj.gov

**SCOTT BRADFORD,**
**ACTING CHIEF,**
**COUNTERINTELLIGENCE AND**
**EXPORT CONTROL,**
**NATIONAL SECURITY DIVISION**

By: /s/ Ahmed Almudallal
Ahmed Almudallal, Court ID No. A5503226
Trial Attorney, Counterintelligence & Export
Control Section, National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, DC 20530
Telephone: (202) 307-5785
E-mail: ahmed.almudallal@usdoj.gov

Counsel for the United States of America

## **VERIFICATION**

I, Robert Cunniff, hereby verify and declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that I am a Special Agent with the U.S. Department of Commerce  Bureau of Industry and Security, Office of Export Enforcement ("OEE"), that I have read the foregoing Verified Complaint for Forfeiture *In Rem* ("Verified Complaint") and know the contents thereof, and the matters contained in the Verified Complaint are true to my own knowledge, except that those herein stated to be alleged on information and belief and as to those matters I believe to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of OEE.

I hereby verify and declare under penalty of perjury that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

EXECUTED, on this  7   day of August 2025.

Robert Cunniff
Special Agent
U.S. Bureau of Industry and Security
Office of Export Enforcement